# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-79

STATE OF LOUISIANA

VERSUS

ZACHARY ALEXANDER BENCH

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 26440-15
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

Edward Kelly Bauman
Louisiana Appellate Project
P. O. Box 1641
Lake Charles, LA 70602-1641
(337) 491-0570
COUNSEL FOR DEFENDANT-APPELLANT:
    Zachary Alexander Bench


John Foster DeRosier
Fourteenth Judicial District Attorney
Ross Murray
Elizabeth B. Hollins
Assistant District Attorneys
901 Lakeshore Dr., Suite 800
Lake Charles, LA 70601
(337) 437-3400
COUNSEL FOR STATE-APPELLEE:
    State of Louisiana

**PICKETT, Judge.**

<u>FACTS</u>

Julia Barlow, the victim's widow, testified that on August 25, 2015, she spoke to her husband, Jody Barlow, around 8:30 p.m. Julia stated she and the victim lived in Texas and the victim was at Niblett's Bluff, an RV Park near Starks, LA, looking for a place for the two of them to go camping the following weekend. She testified she spent much of the following day trying to contact the victim, calling him around 6:30 a.m. on her way to work along with several other calls and numerous text messages.

Julia stated she left work around 5 p.m. when Jody's sister contacted her and told her Jody had failed to meet their dad for coffee. She contacted Jody's mother, Tammy, and they began searching for him at hospitals, jails, and anywhere they could think to look. Julia stated her and Jody's camper was at the RV park, and she stayed there on August 26 after she was unable to contact Jody. Julia noted Jody was familiar with the Starks area, having spent time there while young. Julia and Tammy reported Jody missing to authorities at 8 a.m. on Thursday, August 27, 2015. Jody's body was found and identified later that day.

Julia testified Jody had been prescribed medication for Attention Deficit Disorder. Julia testified that after Jody's death, she also learned he had been taking additional medication including the narcotic pain reliever Suboxone which were delivered to Jody's father's house. She testified she only remembered one occasion during the three and a half years she and Jody were together where Jody seemed high on narcotics. She further testified that Jody was a loving, generous person whom she had never known to be violent.

Mr. Steven Hyatt, a life-long resident of Starks, Louisiana, testified that he saw the defendant, Zachary Alexander Bench, in a side-by-side vehicle on the

morning of August 26, 2015. Mr. Hyatt identified a picture of the victim's side-by-side as the vehicle the defendant was riding when Mr. Hyatt spoke to him that morning. Mr. Hyatt also verified that he had previously picked the defendant out of a photo lineup.

Mr. Matt Nichols, an employee at Niblett's Bluff, an RV park, testified that he spoke with Elizabeth Demarest, the defendant's girlfriend, between 7:30 and 8 in the morning on August 26, 2015. Mr. Nichols testified Ms. Demarest was upset and crying and told him she "was looking for Jody and Zack." He also testified he knew Ms. Demarest from Vinton High School, as it is a small town, and that she left through the front gate of the park headed toward a side-by-side.

Mr. James McDonald, a friend of Jody Barlow's, testified Jody typically kept his side-by-side at James's house, as Jody lived in Houston and had nowhere to store it. He stated Jody had picked up his side-by-side around 10 p.m. on August 25, 2015. Mr. McDonald also testified that the following morning, he saw Jody's truck, pulling his side-by-side on its trailer, but that the truck did not honk the horn at him like Jody always does. This occurred in front of Mr. McDonald's business on Wright Road. Mr. McDonald believed he saw Jody's truck around 10 or 10:30 a.m., then again about thirty minutes later.

Ms. Brenda Doyle, a fifty-nine-year resident of Calcasieu Parish, testified that on the morning of August 26, 2015, sometime between 9:45 and 9:55 a.m., she saw smoke just above the tree line while driving to her mother's house. She marked the area where she saw smoke on a pair of aerial photographs of the Greenmoor area, noting she never saw fire, just the smoke. Ms. Doyle acknowledged that she never reported the fire she believed she saw. Ms. Doyle did note however, that it was common for people to burn things in the area and she only noticed the smoke because there was a strong smell emanating from it.

Mr. David Smith, a retired Calcasieu Parish resident, testified that on August 27, 2015, he and his wife discovered a body hidden underneath their boat near their normal fishing spot. He testified he never got closer than about ten feet from the body, but that he called 9-1-1 once he was able to get out of the woods where his phone had service.) Mr. Smith noted you would need some type of off-road or four-wheel-drive vehicle to reach the spot where his boat was located.

Jason Alexander, a Lieutenant with the Calcasieu Parish Sheriff's Office's forensic investigative unit, testified that he oversaw the collection of evidence at the scene of the crime, assisted in some of the evidence collection, and took photographs at the scene. The state introduced photographs Lieutenant Alexander identified as photographs he took at the defendant's home. The state also introduced photographs Lieutenant Alexander took at the burn site.

Lieutenant Alexander identified a number of items he recovered, including a muddy pack of Marlboro Light cigarettes and a muddy Porter-Cable light recovered from the defendant's bedroom as well as a Marlin Model 60 .22 caliber rifle recovered from the living room of the defendant's home. Lieutenant Alexander acknowledged on cross-examination that he did not know who owned the rifle and that he collected evidence irrespective of its ultimate relevancy to an investigation.

Sergeant Kent Johnson, a ten-year veteran of the Calcasieu Parish Sheriff's Office, testified that he recovered a pair of latex gloves at the burn site.

Detective Brandon Peresich, a member of the Calcasieu Parish Sheriff's Office's Forensic Division, testified that he created a hand-drawn sketch at the body site and recovered evidence from the site. The evidence included a couple of Marlboro Light cigarette butts, several spent .22 caliber shell casings, and multiple live .22 caliber rounds.

Ms. Melissa Durflinger, a sixteen-year veteran of the Calcasieu Parish Sheriff's Office, testified she is part of the Forensic Investigative Unit and took a number of pictures of the body site which were introduced into evidence. Ms. Durflinger also collected a partially burned cigarette from next to the victim's right hand.

Mr. Charles Hunter, Jr., the chief investigator for the Calcasieu Parish Coroner's Office, was certified as an expert in the field of "death investigation." He discussed the process the coroner's office takes in documenting and recovering evidence from a victim's body, which in this case included small caliber bullets taken from the victim's neck and head.

Jade Marler, a SANE (Sexual Assault Nurse Examiner) nurse at Lake Charles Memorial Hospital, testified she drew blood and obtained buccal swabs from the defendant on August 29, 2015.

Terry Faulk, a deputy with the Calcasieu Parish Sheriff's Office, testified that he was called out to an area about a quarter-mile west of Greenmoor regarding the discovery by a couple of people on four-wheelers of a burned-out truck. He was not sure if it was August 28 or 29, 2015.

Bob Nordan, fifteen-year veteran of the Calcasieu Parish Sheriff's Office, testified that he is a security auditor in the corrections department whose duties include flying a drone in order to get aerial surveillance photographs. Mr. Nordan stated that on August 28, 2015, he was called out to deploy the drone and take photographs of the burn site.

Lieutenant Nicholas Heinen of the State Fire Marshal's Office was accepted as an expert in the field of fire origin and cause investigation. Lieutenant Heinen investigated the burned truck, trailer, and side-by-side at a warehouse after the sheriff's office secured the vehicle. Lieutenant Heinen testified that the truck "was

4

burned down to the bare metal" and he was unable to definitively determine the cause of the fire. Lieutenant Heinen noted the truck was powered by diesel, which burns at a lower rate than gasoline and thus burns longer, and that it is uncommon for a diesel-powered vehicle to self-ignite. Lieutenant Heinen was unsure of the date of his examination of the truck.

The state's next witness was LeeAnn Hebert, the former general manager of Hebert's Country Grocery in Vinton, Louisiana. She testified she knew the defendant by face, but not name, and identified him in open court. Ms. Hebert testified that the defendant always came to the store in a cut-off shirt and shorts, and typically bragged about his possessions. She stated that on August 26, 2015, however, the defendant came in wearing a long-sleeved shirt, a ball cap, and was very quiet. She also stated it was the first time she had ever seen him wear a ball cap.

Detective Cory Myers, a sixteen-year veteran of the Calcasieu Parish - Sheriff's Office who is currently a vehicle crimes detective, testified that he worked a missing person's report on Jody Barlow on August 27, 2015. He testified that he spoke with the defendant at the defendant's residence in Vinton. Detective Myers stated that during this initial conversation, the defendant denied knowing who Jody was and even acted as if he thought Jody was a woman.

The state then called Michelle Bench, the defendant's mother. Ms. Bench testified that on August 25, 2015, the defendant, who was living with her at the time, left sometime after 10 p.m. to "go somewhere with someone" and that she went right back to sleep. Ms. Bench stated she woke up about 5:15 a.m. the following morning and left for work around 6:15 a.m. but did not know if the defendant was at home. She testified that when law enforcement initially contacted her, she told them Elizabeth, the defendant's girlfriend, was looking for

5

the defendant so she assumed he was not home. She also testified the family owned a camouflage side-by-side and that the defendant had spent about two years in the Navy.

Ms. Bench testified that the defendant's biological father disappeared from his life around the age of seven and that the defendant's step-father was an alcoholic who was physically abusive toward the defendant at least once, noting they believed he had broken the defendant's ribs in early 2012. Ms. Bench claimed that it was common for the defendant to wear a ball cap and that he frequently wore a long-sleeved flannel shirt even when it was hot. She testified that the defendant had a little trouble with male authority figures and that it pre-dated his military service and continued after it.

The state next called Detective Patrick Smith, a digital forensics investigator for the Calcasieu Parish Sheriff's Office who was a violent crimes investigator in August of 2015. Detective Smith testified that as part of the investigation he obtained surveillance footage from Niblett's Bluff RV Park. The videos introduced by Detective Smith show Elizabeth Demerest arriving at Niblett's Bluff RV Park at approximately 7:39 a.m. and leaving at 7:46 a.m. on August 26, 2015. Detective Smith also noted he recovered video from approximately 10:25 a.m. the same day from Dollar General, where Ms. Demerest purchased supplies to treat burns.

Detective Smith testified video pulled from the Starks E-Z Mart gas station established both the defendant and the victim were at the gas station simultaneously prior to Jody Barlow's disappearance on August 25, 2015. Video from the Starks Truck Stop also showed the defendant and the victim walking around the store and approaching the register together, as well as leaving. The video was taken around 11 p.m. on August 25, 2015.

Detective Smith testified video pulled from Hebert's showed the defendant getting gas in his truck at 8:32 p.m. on August 25, 2015. The truck left at 8:35 p.m. Another video taken from Hebert's from August 27, 2015, showed the defendant wearing a long-sleeved shirt and a ball cap.

Detective Smith testified that on the night of August 27, 2015, he and Detective Casey LaFargue interviewed the defendant. The defendant executed a waiver of *Miranda* rights form at 1:24 a.m. on August 28, 2015. Detective Smith stated that, initially, the defendant was interviewed as a potential witness, the last person to see the victim alive. Thus, the defendant was not read his *Miranda* rights until about a quarter of the way through his interview. Detective Smith noted that, after the interview, he subsequently noticed burn marks on the defendant's body, including burns to both arms.

*Defendant's Interview*

The defendant's interview with Detectives Casey LaFargue and Patrick Smith began at 12:51 a.m. on Friday, August 28, 2015. The defendant initially told the detectives that he had never met Jody. He then stated he met Jody "last night at the gas station---or maybe it was the night before that." The defendant stated he bought Jody some ice when he met him at Hebert's in exchange for tire spacers for the defendant's truck and that he and Elizabeth went to town to hang out with his friend Brandon. The defendant told detectives he saw Jody again around 1:00 a.m. when Jody came to his house after seeing his truck. There appeared to be considerable confusion between the detectives and the defendant regarding when these events happened.

The defendant stated he tried to wake Elizabeth up to go with him, even though he claimed he did not want to go with Jody, but she stayed behind. He claimed that although Jody said he wanted to go to an area called Dynamite, he

instead went towards Starks, stopping at multiple gas stations. The defendant stated that Jody was using a prepaid phone to call people trying to get some "bars."

The defendant claimed he was getting paranoid because Jody was heading towards Starks, not Dynamite, so the defendant told him he had bars at his house so that Jody would bring him home. The defendant stated he pretended to look for bars before telling Jody he could not find them and that his "baby mama's tripping on [him]," at which point he claimed Jody left and he never saw him again.

The defendant stated he told other sheriff's deputies he was probably the last to see Jody alive because he had been with him late into the morning, then proceeded to reiterate that Jody was "fucked up," had taken three or four Xanax, was falling asleep at the wheel, and "had a gun on him tripping me out---a little revolver." When asked what the gun looked like, the defendant responded "It was a gray revolver. I didn't---I never touched it." The defendant claimed both his mom and Elizabeth saw him come home around three a.m. that morning. He also claimed that his mom looked out her bathroom window and saw him. The defendant claimed that when Elizabeth woke up, he was in a different room and she got angry and was looking for him around the house and at his grandmother's house next door. He then stated he met Jody for the first time Wednesday night.

After Detective Smith asked the defendant to go through his story again, the defendant stated the last time he saw Jody was about 4 a.m. Detective Smith then exited the room, and upon re-entry the detectives executed a *Miranda* rights waiver form. The defendant stated he decided to go with Jody because it was clear Jody was not going to leave, so he decided he might as well go and have some fun. The defendant again stated he started getting worried because Jody headed towards Starks, not Dynamite, stopped at multiple gas stations, was carrying a gun and had been taking pills, namely Xanax. He claimed Jody was arguing with someone on

the phone about getting more Xanax, and the defendant lied to him about having pills at his house so that Jody would bring him home. The defendant also claimed that when he told Jody at his house that he could not find the Xanax that Jody was annoyed and had his hand on the gun he was wearing on his hip. He was also adamant that his mother woke up and saw Jody outside the house when they returned. The defendant stated he was wearing a white t-shirt, sweatpants and boots when they stopped at the gas stations.

The defendant told the detectives that he was at home sleeping in bed with his daughter when Elizabeth woke up, to which the detectives informed him that Elizabeth claimed he was at his friend Brandon's house. The defendant subsequently admitted to taking half of a bar himself, and told detectives that Jody had "quite a few prescriptions in his glove box." He then claimed they never went mud-riding and that they never took the side-by-side off the trailer. The defendant asked the detectives if Jody was okay, to which they responded "[y]ou're the last one to see him, so we're hoping you can tell us." The defendant repeatedly denied having ever been to Jody's camper. The defendant stated that after Jody brought him home around 4 a.m., he went inside and did not leave again until after the sheriff's deputies woke him up around 11 a.m.

Detectives Smith and LaFargue left the defendant alone, during which time he stated out loud that he "sure hope[d] everything's okay." After about ten minutes alone, the defendant again speaks aloud, wondering why violent crimes is looking into a missing persons case.

After initially telling the detectives that he had no problem with them searching his home and truck and telling them he had no problem helping with anything they needed, the defendant was reluctant to give written consent for the sheriff's office to search his home, so the detectives ceased requesting for his

9

consent. Again, the defendant admitted to taking half of a Xanax bar, stating Jody had already broken them up but also claimed he saw Jody take a whole bar. When Detective LaFargue mentioned maybe they had gone somewhere else that he had not mentioned, the defendant was adamant that he had already told the detectives everywhere that he and Jody went. Again, he stated that he went home and that his mother saw him when he arrived.

The defendant stated that he was wearing a white shirt in the videos from the gas stations, as he and Jody switched shirts and he took Jody's orange cut-off shirt on the way home. The defendant repeatedly stated that they "never got that side-by-side off the trailer. When he was with me, that side-by-side was on the trailer." At this point, the Detectives exited the room for roughly eight minutes. When asked about talking to the deputies who woke him, the defendant stated he told them he did not know Jody because he did not remember his name.

Detectives Smith and LaFargue confronted the defendant with the fact that his mother said she never saw anyone drop him off, and he continued to insist that she saw him get dropped off by Jody around 4 a.m. When asked why Elizabeth would say he was at Brandon's when he claimed to be asleep in the house, the defendant stated "[s]he probably just thought---look, she probably thought that in the emergency situation that we were talking to the police, that's where she should say I go." When asked if Jody had any other guns, the defendant claimed Jody only had the revolver that he was carrying strapped to his hip.

The detectives continued to disbelieve the defendant's story that he was at home from 4 a.m. onwards, given his mother's statement that she did not see him come home but saw his daughter asleep on the couch and Elizabeth's statement that he was at Brandon's house. The defendant continued to insist that he was home the entire time.

10

Going back over the gas stations, the defendant gives descriptions of the three gas stations he and Jody visited. He stated the reason Jody was cold, which led to them switching shirts, was the fact the windows were down because they were smoking; the defendant was smoking Marlboro Red 100's and Jody was smoking Marlboro Lights. The defendant informed the detectives that his gun, which he previously noted he picked up and put by the front door when Jody brought him home, had been previously returned to his mother's night stand, then the recording skipped and the defendant was sitting by himself due to the detectives' having to switch disks for the recording.

The defendant acknowledged the detectives did not attempt to speak with him while they were switching disks. When asked about the weapon he told the detectives he placed by the door when Jody dropped him off, the defendant stated it was his mother's, and the detectives informed him she said there was no way he went into her room and grabbed the weapon. He claimed he went in without waking her, despite his prior claims that she was already awake when he came home. When the defendant stated he was done talking, Detective LaFargue asked where Jody was and told the defendant that "[h]e's fucking dead!" Detective LaFargue then left the room, and the recording was stopped roughly a minute later.

Following the playing of the defendant's interview for the jury, Detective Smith went through a detailed series of images from Google Earth that indicated the location where Ms. Doyle testified she saw smoke was approximately where Jody Barlow's truck, trailer, and side-by-side were burned, and which further indicated Mr. Steven Hyatt would have seen the defendant while the defendant was driving said truck, trailer, and side-by-side to the burn site. Detective Smith testified that he spent eight years in the United States Army and discussed the DD Form 214, the military discharge papers. Detective Smith noted that Jody

11

Barlow's DD 214 indicates that he was a chemical operations specialist assigned to the first Special Forces group out of Fort Lewis, Washington. Detective Smith noted the DD 214 made it apparent Jody Barlow was not Special Forces-trained and that he received a general separation under honorable conditions but that it also noted "[m]isconduct. And in parenthesis [sic] it says 'Drug abuse.'"

Warden Orey Scot Nugent of the Calcasieu Parish sheriff's prison took the stand, noting he had been the warden since October of 2015 and had been the custodian of inmate telephone records since 2004. The state introduced copies of two telephone calls made by the defendant.

Ms. Cheryl Swearingen, a thirteen-year veteran of the Louisiana State Police Crime Lab, was recognized as an expert in the field of firearms examination. After discussing the procedure for test firing and comparing spent rounds, Ms. Swearingen testified she was able to confirm that none of the recovered rounds were fired from the Marlin rifle recovered at the defendant's home. Furthermore, she determined eight of the nine shell casings recovered were fired from the same weapon, but she was unable to say with certainty whether the ninth casing was fired by the same weapon. She testified that aside from the bullet recovered from Jody Barlow's neck, the bullet fragments represented pieces of six .22 caliber bullets pulled from Jody Barlow's head. Additionally, she noted there were fragments that were too damaged to determine if they were part of the other bullets or if they were additional bullets. On cross-examination, Ms. Swearingen testified the only gun ever submitted to her for testing was the Marlin rifle recovered from the defendant's home, which was not the murder weapon.

Ms. Monica Quaal of the Southwest Louisiana Crime Lab was accepted by stipulation as an expert in forensic DNA analysis. Ms. Quaal testified she was unable to obtain a good DNA profile from the latex gloves found at the burn site.

She also stated the DNA profile she obtained from the recovered koozie belonged to Jody Barlow. She also testified that she recovered the defendant's DNA from two of the cigarette butts which were recovered at the body site and one with the victim's DNA on it. Ms. Quaal also testified she found two spots of blood on the Porter-Cable light recovered from the defendant's home and that both spots were matches to Jody Barlow.

Lieutenant Brent Young, of the Calcasieu Parish Sheriff's Office's sex crimes division, testified he was the lead detective on the case when he was senior sergeant with the violent crimes unit. Lieutenant Young testified that Jody Barlow's orange cut-off t-shirt, which the defendant claimed in his interview would be at his home, was never recovered. Jody's Porter-Cable flashlight, which had Jody's blood on it, was recovered from the defendant's home.

Lieutenant Young testified that he had listened to the defendant's jail calls. The calls were played to the jury, after which and Lieutenant Young noted the defendant had mentioned potentially going to Arkansas. There was a discussion of threats which were allegedly made against the defendant's mother and Elizabeth, with Elizabeth reporting that she had been run off the road. Defense counsel repeatedly raised the issue of a man named Pablo Rojas to Lieutenant Young, who stated they never followed-up on Rojas as a suspect because they could never eliminate the defendant as a suspect and the evidence kept pointing to the defendant.

Dr. Terry Welke, the Calcasieu Parish Coroner, was accepted by stipulation as an expert in the fields of medicine and forensic pathology. Dr. Welke testified he performed an autopsy on Jody Barlow on August 29, 2015. Dr. Welke stated Jody Barlow's death was a homicide as a result of multiple gunshot wounds to the head and neck, noting there were seven wounds. Dr. Welke's autopsy report was

13

admitted into evidence. Dr. Welke testified Jody had no defensive wounds on his body and Dr. Welke felt the order of shots would have been the shot to the back of the neck,[1] followed by the five shots to the right side of the head, then the final shot to the top of the head.

On cross-examination, Dr. Welke verified the order of shots fired was his own theory, not something that could be definitively proven. Dr. Welke also verified that Jody's toxicology report showed six drugs in his system at various quantities: phentermine, nordiazepam, alprazolam, buprenorphine, norbuprenophine, and naloxone. Dr. Welke noted the levels of some of the drugs were higher than one would normally expect in an individual properly taking medication but noted that psychiatrists sometimes advise patients to take higher dosages when the medication is not working properly. Accordingly, he could not say the levels of the drugs indicated to him a substance abuse issue.

The defendant's case-in-chief consisted entirely of testimony from the defendant. Initially, the defendant's testimony centered on his family life, the loss of his step-father and the impact of that loss on him, and his "protective, defensive" personality. Acknowledging that he has a history of lying, the defendant admitted the following lies with regards to his recorded statement: "I told the detectives that I was overseas. I told the detectives that Jody Barlow had brought me home. I told the detectives that my mother had saw [sic] us, and I also told them that I was telling the truth when I was lying." He also acknowledged that during his interview, he was aware that Jody Barlow was dead.

---

[1]Dr. Welke's report lists the shot to the back of the neck as medium-range, which Dr. Welke described as being a shot where there is less than two feet between the barrel of the gun and the victim. The other six shots were of an indeterminate range, meaning some distance greater than two feet between the gun and the victim.

The defendant stated that while he was a veteran who served in the Navy, he was not a combat veteran nor had he ever been sent overseas. He testified that while enlisted he was an electronics technician and that he left the Navy over issues arising from him being a single parent with full custody of his daughter, noting he was unwilling to give up custody. The defendant also acknowledged that he received an Article 92 reprimand for returning to base late before he received his general separation under honorable conditions.

The defendant's description of how he met Jody was rather identical to the story he told detectives during his interview, aside from his adding that Jody made a comment about Elizabeth being cute and asking if she had any friends. The defendant testified he and Jody discussed going fishing or mud riding either the next day or on the weekend, but that his phone was turned off so Elizabeth took down Jody's number. As in his interview, he testified he and Elizabeth went to his friend Brandon's house after leaving the gas station and that he did not see Jody again until Jody showed up at his house around 11 or 11:30 p.m.

Again, the defendant stated he did not want to go anywhere with Jody, but that after talking to him he "figured we might have some fun, and I went ahead and went." He stated Jody "seemed like he was on something, but that's not necessarily odd where I live. And it wasn't that bad at the time." The defendant stated he told Elizabeth he was going, but she was sleeping and chose not to go with him. The defendant testified they drove around for a few hours while Jody was drinking and taking multiple drugs from pill bottles in the center console of his truck including Xanax, again claiming he only had one beer and two pieces of a Xanax pill.

The defendant testified that he had a habit of calling everyone "Bill" as a throw-away name when he was not familiar with them and claimed that as the

15

night went on Jody got progressively more annoyed by the defendant continuing to call Jody "Bill." The defendant testified that as time wore on and Jody continued drinking and taking pills, he began falling asleep while driving and getting more violent and aggressive. The defendant stated that he tried getting Jody to bring him home but that he was afraid of setting him off since he had been taking Xanax.

The defendant testified that eventually they stopped at Old River Road near an area called D-Hart Bend, which he described as "a set of trails in a camping area, follows along a little river." The defendant testified that Jody again mentioned Elizabeth, asking him if he could wake her up or else contact one of her friends, which the defendant claimed put him a little on edge. He then testified he and Jody put a case with a loaded rifle onto the side-by-side and went riding, driving five or six miles into the woods before stopping, at which point Jody continued drinking. The defendant claimed Jody took out the rifle, which he stated shot .45 caliber rounds, and began trying to shoot banana spiders off their webs.

The defendant testified he was standing next to the side-by-side drinking a beer and smoking a cigarette, reloading the rifle for Jody and placing the spent rounds back into the ammo boxes. He stated he eventually reloaded the rifle and handed it back to Jody while calling him "Bill," at which point Jody pushed him. The defendant testified that he had his back turned when Jody pushed him, so he turned around with his arm cocked back as if to hit Jody, at which point the defendant claims Jody tried to draw his pistol and the defendant managed to disarm him and take the pistol. The defendant stated that when he disarmed Jody, he turned around to face Jody with the pistol in hand, saw Jody raising the rifle while looking to the side of him, and pulled the trigger, shooting Jody in the base of his neck. The defendant claimed it was so dark he could not really see well.

16

The defendant testified that Jody was turning towards him with the rifle, so he fired until the revolver was empty, noting it was an eight-shot revolver. The defendant stated Jody fell towards him and the defendant pulled the rifle away from him before realizing what had happened, at which point he panicked. He testified that after he covered Jody's body with a small boat to keep animals from getting at it, he took Jody's side-by-side because it "was several miles off into the middle of nowhere, and there was just no way to get out of there without an ATV." The defendant testified that once he got back to Jody's truck, he loaded the side-by-side back onto the trailer and went home in Jody's truck, around sunrise.

Th defendant stated that he went home, woke Elizabeth up and told her to meet him on Greenmoor Road in about fifteen minutes, then drove Jody's truck as if they were heading to Dynamite through a logging trail. He testified that once he drove the truck onto the logging trail, he used a gas can that was in the truck to set it all on fire "to destroy evidence." He claimed he was not thinking very clearly and that he burned himself while igniting Jody's possessions. When asked why he did not attempt to sell Jody's truck and side-by-side, the defendant responded "the only reason I got on the side-by-side was to get out. And the only reason I took the truck was because I was an hour away from home, and it was the only way I was getting home." The defendant testified that he did not call the police because he thought it would mean "[his] life was going to be over."

The defendant testified that when he got home, Elizabeth was the only person home, but she was sleeping, so he put on a long-sleeved shirt and woke her up without telling her that anything had happened. The defendant also testified that he was unsure how the Porter-Cable light with Jody's blood ended up in his bedroom, but that he had taken both of Jody's guns home to dispose of them and eventually melted them down with an oxy-acetylene torch at his house.

The defendant testified that Elizabeth picked him up on Greenmoor Road without knowing what had happened and that she bought supplies to treat his burn later when he told her he had burned himself. The defendant clarified that when he spoke to his mother on a phone call about leaving for Alaska "if he got out," that he meant if he was found not guilty he would have to leave, stating it was impossible for him to be able to make bond and get out without going to trial first.

On cross-examination, the defendant acknowledged the muddy cigarettes recovered from his house were cigarettes bought by Jody. He also confirmed that he and Elizabeth both smoked the joint he got from Brandon. The defendant stated that he commented on Jody nodding off while driving, but that Jody took a different pill and seemed to be fine after that. When asked why he asked Steven Hyatt for directions to D-Hart Bend after saying he had been there a few times, the defendant testified that he did not remember that happening, and that he might not remember because he was on drugs at the time. The defendant argued Jody went for his pistol, rather than the loaded rifle the defendant had just handed him, because it was too close for him to use the rifle but could not explain why the shot to Jody's neck went straight through when the defendant testified he was turning toward him and did not have his back to him. He ultimately stated he was never sure what had happened to the rifle, but he assumed Jody was raising it toward him because it was near him when he fell down dead. The state pointed out the inconsistency with defendant's initial story that he put on a long-sleeved shirt to cover up his burns before he woke Elizabeth up, but testified that he woke her up before he went and burned the truck.

The state questioned the defendant about his destruction of evidence, namely Jody's vehicles and guns, noting the defendant destroyed the best evidence of his claim of self-defense, the rifle with which he claimed Jody was coming after him.

18

The defendant responded that he believed .45 caliber shell casings were found at the scene and was confused by the state's assertion that no .45 caliber shell casings were found at the murder scene. The defendant testified that he did not clean up the murder scene, that he covered up Jody's body then jumped in the side-by-side and ran. His only explanation for why there were no .45 caliber shells at the scene was his claim that he was placing the shells back into the ammo boxes as he went. Finally, the defendant could not explain how the final shot happened that would lead it to pass through the victim's skull, which Dr. Welke testified could have been from someone standing over Jody and shooting down.

On December 17, 2015, a grand jury indicted the defendant, Zachary Alexander Bench, on charges of second degree murder, in violation of La.R.S. 14:30.1; armed robbery with a firearm, in violation of La.R.S. 14:64 and 14:64.3; and obstruction of justice, in violation of La.R.S. 14:130.1. The defendant went to trial on the above charges on March 6, 2017, and on March 10, 2017, the jury found him guilty as charged of second degree murder and obstruction of justice. The jury found him not guilty of armed robbery with a firearm. Polling of the jury revealed a 10-2 verdict on the second degree murder charge and a unanimous verdict on obstruction of justice.

On June 19, 2017, the defendant filed a motion for new trial under La.Code Crim.P. art. 851, alleging the verdict was contrary to law and evidence; there was new evidence, namely trial counsel was able to confirm the make and model of the weapons involved (there were identification issues at trial as the defendant had taken a blowtorch to the guns); and the "ends of justice would be served by the granting of a new trial." The motion was denied without reasons the same day.

On June 23, 2017, the defendant received a mandatory life sentence without benefit of probation, parole, or suspension of sentence for the second degree

murder conviction and a forty-year sentence for the obstruction of justice charge. Both sentences are at hard labor and were ordered to run consecutively.

The defendant now appeals his convictions and sentences, alleging five assignments of error.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENTS OF ERROR

1. The evidence presented at trial was not sufficient to negate a claim of self-defense. In the alternative, the evidence at trial was insufficient to support a conviction for Second Degree Murder.

2. The prosecutor committed prosecutorial misconduct by commenting on the evidence or the lack thereof.

3. The trial court erred in interjecting during defense counsel's voir dire examination. In the alternative, counsel was ineffective for failing to object or request a mistrial.

4. The non-unanimous verdict for second degree murder is unconstitutional.

5. The imposition of consecutive sentences was constitutionally excessive.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the defendant claims the evidence presented at trial was insufficient to negate his claim of self-defense or, in the alternative, that the evidence was insufficient to support a conviction for second degree murder.

The analysis for a sufficiency claim is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational

20

trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Under La.R.S. 14:30.1, second degree murder is relevantly defined as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm." As the fourth circuit recently noted in *State v. White*, 14-397, p. 17 (La.App. 4 Cir. 7/29/15), 174 So.3d 177, 189, *writ denied*, 15-1577 (La. 10/10/16), 207 So.3d 408 (footnote omitted), "to prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes."

As noted by the defendant, "[t]here is no question that [the defendant] shot Jody Barlow. [The defendant] took the stand and testified to this fact." Nonetheless, the defendant claims he killed Jody Barlow in self-defense. In *State ex rel. D.P.B.*, 02–1742, pp. 4–6 (La.5/20/03), 846 So.2d 753, 756–57 (footnote omitted), the supreme court explained an appellate court's standard of review when the defendant asserts a claim of self-defense in a homicide case:

"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676,

678 (La.1984). . . . Furthermore, in a case in which defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown*, 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985).

Under La.R.S. 14:20(A)(1), a homicide is relevantly considered justified "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." The defendant testified at trial that he was terrified, despite having just disarmed Jody, because Jody was bringing a .45 caliber rifle to bear on him and the defendant was aware of how much damage a .45 caliber bullet could do to him.

The jury was presented with two arguments about what happened out in the middle of the woods the night Jody Barlow died. The state argued that the defendant murdered Jody Barlow with a specific intent to kill or to inflict great bodily harm. The defendant claimed that Jody had drawn a pistol on him, which the defendant took from Jody, then went after the defendant with a rifle the defendant had just loaded. The defendant, fearing for his life, shot Jody in the head seven times at close range. As noted above, "when the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense." *D.P.B.*, 846 So.2d at 757.

The only evidence presented to support the defendant's claim of self-defense was the defendant's own self-serving testimony. Indeed, the defendant's version of events required Jody Barlow to be coming after the defendant with a .45 caliber

rifle to justify the defendant's belief that his life was in danger and his action based on said belief. No evidence supported the claim of a .45 caliber rifle being at the murder scene. No .45 caliber shell casings were recovered from the body site to corroborate the defendant's claim that Jody was shooting banana spiders with the rifle. The defendant testified he decided to melt down and dispose of the rifle which meant there was no rifle which might have been recovered and tested to determine if it had indeed been fired recently.

This case boils down to an issue of witness credibility, namely, whether the jury found the defendant's story of self-defense credible. Given the defendant's admitted history of lying, his prior lengthy set of lies to detectives viewed by the jury, and the lack of any evidence to corroborate the defendant's claim that Jody Barlow was bringing a .45 caliber rifle to bear on him when he shot Jody seven times in the head and neck at close range, with the first shot being to the back of his neck, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense." *Id.*

The defendant argues that, alternatively, his conviction should have been for manslaughter, not second degree murder, because "[a]ny rational trier of fact could have found [Defendant] established the mitigating factors of manslaughter by a preponderance of the evidence." Specifically, defendant argues he never had "the specific intent to kill or inflict great bodily harm on anyone." Although the defendant did not argue that the death of Jody Barlow was manslaughter to the jury, the jury was nonetheless instructed as to the law regarding manslaughter as a responsive verdict. Nonetheless, ten members of the jury found the defendant had committed murder with specific intent rather than manslaughter. Although the defendant cites *State v. Carmouche*, 12-1052 (La.App. 3 Cir. 4/3/13), 117 So.3d

23

136, for the proposition that lack of motive may be considered as mitigating against a finding of specific intent, reliance on *Carmouche* is misplaced.

In *Carmouche*, the defendant was charged with second degree murder and found guilty of the responsive verdict of manslaughter. On appeal, the defendant argued the evidence failed to establish either second degree murder or manslaughter, arguing there was no evidence presented to suggest the shooting happened "in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection" as required by La.R.S. 14:31(A). This court did note that "[a]lthough motive is not an essential element of second degree murder, 'a lack of motive may properly be considered as a circumstance mitigating against specific intent.'" *Carmouche*, 117 So.3d at 146 (citing *State v. Mart*, 352 So.2d 678, 681 (La.1977)). However, this court also upheld the defendant's conviction for manslaughter given "the evidence at trial supported the verdict of manslaughter because it could have sustained a verdict for second degree murder." *Id*. at 145.

In the instant case, the state proved specific intent to kill existed. This court noted in *Carmouche* that specific intent to kill or inflict great bodily harm can be found based on a defendant's "actions during and after the commission of the offense." *Id*. at 146. The *Carmouche* court noted "specific intent may be inferred when a wound is inflicted at close range . . . or when a weapon is pointed directly at the victim." *Id*. Additionally, the *Carmouche* court noted:

> Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt. This rule applies notwithstanding that the evidence may disclose another crime. *State v. Brown,* La., 322 So.2d 211 (1975); *State v. Graves, La.,* 301 So.2d 864 (1974); *State v. Nelson,* 261 La. 153, 259 So.2d 46 (1972). See also *State v. Lane, La.,* 292 So.2d 711 (1974); *State v. Johnson,* 249 La. 950, 192 So.2d 135 (1966); *State v. Goins,* 232 La. 238, 94 So.2d 244 (1957); 29 Am.Jur.2d, Evidence, §§

280 et seq., pp. 329 et seq. A court may admit a wide range of evidence to prove flight, concealment, and attempt to avoid apprehension. *State v. Nelson, supra.*

117 So.3d at 146 (citing *State v. Davies*, 350 So.2d 586, 588 (La.1977)).

In addition to shooting Jody Barlow in the back of the neck from a distance of less than two feet and following that shot with six more shots to the head, the defendant fled the scene of the murder, burned up Jody's vehicle and side-by-side in order to conceal evidence, then lied to the police about what happened in order to try and avoid suspicion. All of these actions can be viewed as indicative of the defendant's guilty conscience. We find that "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense." *Jones*, 128 So.3d at 597.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, the defendant claims the state "committed prosecutorial misconduct by commenting on evidence or the lack thereof," specifically noting the state's attacking the defendant's claim regarding the recovery of .45 caliber shell casings from the body site.

As noted by the defendant, La.Code Crim.P. art. 774 confines the scope of opening and closing arguments: "The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or the defendant may draw therefrom, and to the law applicable to the case." As previously noted, there were no .45 caliber shell or shell casings found at the body site, where the defendant claimed Jody had been shooting at banana spiders with the .45 caliber rifle with which the defendant claimed Jody was trying to aim at him.

25

As noted by the fourth circuit in *State v. Wiley*, 16-999, p. 23 (La.App. 4 Cir. 11/15/17), 231 So.3d 774, 790, "prosecutors have wide latitude in choosing closing argument tactics," and "the trial judge has broad discretion in controlling the scope of closing arguments." During closing argument, the state referenced the defendant's claim that .45 caliber casings were found at the scene of the murder, noting that "[n]ot one place at that crime scene was there a .45 casing collected." As it was clear, in context, the state was talking about the body site when it said "that crime scene," the state's comment was an accurate reflection of the physical evidence recovered and entered into the record at trial. The defendant next complains about the state's objection to defense counsel talking about the .45 caliber shells recovered from the truck on the ground, as those shells and their recovery was never in evidence. The objection was sustained because, while the recovery of those shells was included in the appellate record as part of the state's discovery responses, the shells were never discussed or introduced into evidence during the trial itself. Again, the state's comment was accurate.

Finally, the defendant contends it was misconduct when the state again referenced the fact that there were no .45 caliber shells recovered from the body site during rebuttal argument. Again, the state's comments are supported by the record. Despite the defendant's contention that "[t]heir assertion that there were no .45 casings recovered was misleading and false, even if the casings were not admitted into evidence[,]" the fact remains that, taken in context, the state's comments were completely accurate. There were no casings found at the scene of the murder, which is where the defendant argued during his testimony the rifle was used. As La.Code Crim.P. art. 774 allows argument regarding "evidence admitted" as well as "lack of evidence," the state's comments were completely proper and within the scope of argument allowed by law. Additionally, the article

26

clearly allows the state to respond to the defendant's proposed version of events during rebuttal. Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, the defendant claims the trial court erred by interjecting during voir dire or, alternatively, that trial counsel was ineffective for not objecting to the interjection. The defendant's argument is based on a portion of voir dire in which defense counsel was attempting to explain the meaning of the state having the burden of proof beyond a reasonable doubt. Defense counsel was attempting to discuss the state's burden and there appears to be confusion on the part of prospective jurors regarding that burden. The trial court attempted to help the defense get the point across that the state must prove its case, not vice versa. The defendant claims "[d]efense counsel was stripped of voir dire by the court's altering of the flow of voir dire and subsequent tainting of the jury pool. However, no objection was made nor was a mistrial requested by defense counsel. The failure to do so rendered counsel ineffective." Additionally, the defendant claims "[t]he trial court only seemed to confuse the prospective juror even further by its help. Accordingly, counsel's performance must be deemed ineffective under the *Strickland* [*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984)] standard of review, and Zachary's convictions must be reversed."

This interpretation of the exchange lacks merit. Not only did the prospective jurors appear to understand, after the court's interjection, that they should vote not guilty if they feel the state has not proved its case beyond a reasonable doubt, defense counsel continued voir dire after the interjection and even noted the trial judge was attempting to assist her in explaining her point. After two different potential jurors appeared to be confused about the effect of reasonable doubt on the state's burden, the following exchange occurred:

27

**THE COURT:** Let me just interject here and just say that, you know, I know it's kind of hard when we're only talking about theory and you don't have any facts to go along with it to digest and to think about. But, I mean, I think in theory, like, as you were asked earlier, if the State said, okay, let's just say if y'all were the jurors in this case and the State said, okay, -- and I said, "Okay. Let's go ahead and get started. Put on your evidence." And the State said, "Okay. Look, we rest. We don't have any witnesses to call," what your verdict be?

**PROSPECTIVE JUROR:** I would have to go to the defense -- I mean, to the --

**MS. GEORGE:** Hang on.

**THE COURT:** Well, hang on a second. Well, I'm going to let you go ahead and finish your thought. But let me just explain this to y'all. You understand the State -- is what we've talked about all afternoon -- is the State is required to prove the case against Mr. Bench. All these elements of all these crimes that they've talked about, okay, they have to prove each of those elements to your individual satisfaction beyond a reasonable doubt. They have to prove that with evidence, okay, that, you know, -- so that in order to convict Mr. Bench of those crimes, you have to have no reasonable doubt in your mind, based on the evidence that's presented, that Mr. Bench is guilty of those crimes in order for you to convict him, okay? And they have that burden.

**MS. GEORGE:** Right.

**THE COURT:** Mr. Bench and his lawyers, they don't have to say anything; they don't have to do anything under our constitution, you know?

**MS. GEORGE:** And so what I'm trying to get at is -- and Judge Ritchie is giving me an assist here to help explain -- is that it's a tiebreaker okay? Who gets the benefit of the doubt in your mind?

**PROSPECTIVE JUROR:** Then I'll go with y'all.

**MS. GEORGE:** Why do you think you should do that?

**PROSPECTIVE JUROR:** Well, like if he stated, that they rested and didn't -- didn't give any other [sic] for me to decide upon, then I would go with that.

Nothing about the trial court's interjection interfered with defense counsel's ability to assess the potential jurors' understanding and acceptance of the law. Accordingly, there is no merit to the claim that the court's interjection harmed the defendant or his trial in any way.

With regard to the defendant's claim that trial counsel was ineffective for not objecting to the court's interjection and seeking a mistrial, under *Strickland*, the defendant must prove prejudice in order to prevail on a claim of ineffective assistance of counsel. In order to do so, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The court's interjection had no impact on the defendant's ability to receive a fair trial, the defendant cannot meet the burden of proving prejudice. Accordingly, defense counsel's failure to object and seek a mistrial was not ineffective assistance. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

In his fourth assignment of error, the defendant claims his conviction for second degree murder is unconstitutional because it was obtained from a non-unanimous jury. The defendant argues the trial court erred in refusing to instruct the jury that they "must all agree to the same verdict." This assignment of error lacks merit.

Louisiana Code of Criminal Procedure Article 782 specifically states that "[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." The defendant acknowledges this law; he acknowledges the Supreme Court's ruling in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972), which held a state court conviction obtained by a less than unanimous jury was constitutional, and he acknowledges the supreme court's recent decision to uphold the constitutionality of La.Code Crim.P. art. 782 in *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738. Nonetheless, he contends the non-unanimous jury verdict is a denial of due process. As noted above, this argument has been

made and denied numerous times and is contrary to Louisiana law as it stands. Accordingly, the argument lacks merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

In his final assignment of error, the defendant argues the trial court's imposition of consecutive sentences is constitutionally excessive. The defendant's argument regarding his sentence appears to be confined to the propriety of a consecutive sentence, rather than the actual length of his sentence for obstruction of justice. Louisiana Code of Criminal Procedure Article 881.1 provides the mechanism for preserving the review of a sentence on appeal:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

In *State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356, the defendant failed to object to the sentence imposed at the sentencing hearing and did not timely file a motion to reconsider sentence. Thus, this court found his claim of excessiveness of sentence was barred. *See also State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59.

No objection was made to the consecutive nature of the defendant's sentences, nor was any motion to reconsider sentence ever filed. However, this court has reviewed claims of excessiveness where no objection was made and no motion to reconsider sentence was filed. *See State v. Johnlouis*, 09-235 (La.App. 3

30

Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127; *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352; *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied*, 09-606 (La. 12/18/09), 23 So.3d 936; *State v. Quinn*, 09-1382 (La.App. 3 Cir. 5/12/10), 38 So.3d 1102, *writ denied*, 10-1355 (La. 1/7/11), 52 So.3d 885. Accordingly, we will consider the defendant's complaint regarding the consecutive nature of his sentences.

The defendant acknowledges that, under La.Code Crim.P. art. 883, a trial court has the authority to order consecutive sentences, even when the crimes are "committed as part of the same transaction or series of transactions."

> Concurrent sentences are preferred when offenses arise out of a common scheme or plan. A trial court is given the discretion, however, to impose consecutive sentences in such cases. Louisiana Code of Criminal Procedure Article 883 states that "[i]f the defendant is convicted of two or more offenses . . . constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively." The imposition of consecutive sentences, however, requires particular justification beyond the standard sentencing guidelines, justification which must be articulated by the trial court at sentencing. *State v. Compton,* 11–68 (La.App. 3 Cir. 6/1/11), 66 So.3d 619, *writ denied,* 11–1362 (La.12/2/11), 76 So.3d 1177. "The factors to consider when imposing consecutive sentences include defendant's criminal record, the severity or violent nature of the offenses, or the danger the defendant poses to the public." *State v. Wallace,* 11–1258, p. 14 (La.App. 3 Cir. 5/30/12), 92 So.3d 592, 602.

*State v. Bethley*, 12-853, pp. 11-12 (La. App. 3 Cir. 2/6/13), 107 So.3d 841, 850.

The defendant has no prior criminal history nor did the trial court specifically find the defendant constitutes an unusual risk of danger to the public. However, the fact remains that Jody Barlow was shot seven times, once in the back of the neck at a range of less than two feet and six times in the head. The defendant met Jody Barlow less than twelve hours before he killed him in the

31

woods, and the defendant went to great lengths to destroy evidence in order to attempt to avoid being caught. Indeed, in sentencing the defendant, the trial court stated:

> And, just because of the extent to which he went to to try and to get away with murder, I am going to impose the 40 years, the maximum sentence at hard labor on Mr. Bench. And, even though, generally, the law considers that when it arises out of the same set of facts and circumstances that it generally would be considered concurrent, to be concurrent, just because there was such a degree that Mr. Bench went to to try to -- and he almost did it. He almost got away with murder. I think it's appropriate to have -- to run this sentence consecutive to the life sentence to the extent that really matters. And so, I'm going to impose a 40-year sentence.

Additionally, the trial court noted it considered the aggravating and mitigating factors and applied them in this case without specifically stating which factors were applicable. The trial court made it clear that it was sentencing the defendant to consecutive sentences based upon his attempts to evade responsibility by destroying evidence and for the violent nature of the killing, noting on multiple occasions that it did not believe the defendant's story of how events occurred was credible. Given La.Code Crim.P. art. 883's reservation to the trial court of the authority to give consecutive sentences, we find the trial court committed no error in imposing  consecutive sentences.

## CONCLUSION

The defendant's convictions and sentences are affirmed.

**AFFIRMED.**

32